**UNITED STATES, Appellee**

v.

**Robert R. INGHAM, Chief Warrant Officer Three, U.S. Army, Appellant.**

No. 93–0868.
CMR No. 9002347.

U.S. Court of Appeals for the Armed Forces.

Argued Nov. 8, 1994.

Decided June 23, 1995.

For Appellant: *Bryan G. Hershman* (argued); *Major Fran W. Walterhouse* and *Captain Teresa L. Norris.*

For Appellee: *Major Lyle D. Jentzer* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel James L. Pohl, Major Kenneth T. Grant, Captain Jane F. Polcen* (on brief); *Colonel John M. Smith.*

## Opinion of the Court

COX, Judge:

1. Appellant was tried by general court-martial composed of officer members in Kaiserslautern, Federal Republic of Germany. Pursuant to his pleas, he was found guilty of willfully disobeying an order from a superior commissioned officer and breaking arrest (2 specifications), in violation of Articles 90 and 95, Uniform Code of Military Justice, 10 USC §§ 890 and 895, respectively. Contrary to his pleas, appellant was also convicted of sodomy with a child under the age of 16 by force and without consent (3 specifications), committing indecent acts or liberties with a child under the age of 16 (3 specifications), indecent assault, and adultery, in violation of Articles 125 and 134, UCMJ, 10 USC §§ 925 and 934, respectively. He was sentenced to a dishonorable discharge, confinement for 40 years, and total forfeitures. The convening authority disapproved the element of force and without consent in each sodomy specification, but approved the sentence. The Court of Military Review[1] affirmed these results. 36 MJ 990 (1993).

2. Appellant appeals his conviction on three grounds.[2] First, he contends his counsel was ineffective. Second, he argues his sentence is not appropriate for the findings of guilty. Lastly, he contends that the court below erred in denying his request for a *DuBay*[3] hearing.

## FACTS

The facts, as stated by the Court of Military Review, are as follows:

In 1986, the appellant was assigned as a helicopter pilot to a unit in Japan. He and his wife had marital problems and were divorced. There was one child, Shannon, from this marriage. After the divorce, he met and married his second wife, Colleen, a civilian employee of the Department of the Army stationed in Japan. The new Mrs. Ingham, who was divorced, had her daughter, Staci, who was born in 1978, with her. About a year after the marriage, the appellant and Colleen had a son, Shawn. Living in the home for most of 1988 and 1989 w[ere] the appellant, Colleen, Staci, Shannon, and Shawn.

Colleen was required as part of her job to travel extensively. The appellant was responsible for the children during these absences. In February 1988, the entire family took a vacation to Colorado. The family stayed with the appellant's aunt.

---

1. *See* 41 MJ 213, 229 n. * (1994).

2. The issues presented are:

### I

WHETHER APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO SECURE VITAL WITNESSES FOR THE DEFENSE, WHEN COUNSEL FAILED TO PROPERLY EXERCISE PEREMPTORY CHALLENGES, WHEN COUNSEL FAILED TO OBJECT TO HIGHLY PREJUDICIAL EVIDENCE, WHEN COUNSEL FAILED TO ADEQUATELY CROSS-EXAMINE WITNESSES, WHEN COUNSEL FAILED TO MAKE A MOTION TO SEVER UNRELATED CHARGES, WHEN COUNSEL FAILED TO SECURE A CRITICAL VIDEO OF A CHILD PSYCHOLOGIST, WHEN THIS VIDEO WAS ULTIMATELY LOST, AND WHEN COUNSEL FAILED TO ADEQUATELY REPRESENT APPELLANT AT SENTENCING.

### II

WHETHER THE UNITED STATES ARMY COURT OF MILITARY REVIEW VIOLATED ITS DISCRETIONARY POWER IN FAILING TO SET ASIDE APPELLANT'S SENTENCE OF 40 YEARS' CONFINEMENT FOR A NON-VIOLENT CRIME, WHEN APPELLANT HAS NO CRIMINAL HISTORY AND HAS AN EXEMPLARY MILITARY RECORD, WHEN APPELLANT'S SENTENCE IS CLEARLY EXCESSIVE AND WHEN THE ARMY COURT OF MILITARY REVIEW AND THE COURT OF MILITARY APPEALS [sic] HAVE ADJUDGED CONSIDERABLY LIGHTER SENTENCES FOR SAME OR SIMILAR CRIMINAL CONDUCT.

### III

WHETHER THE UNITED STATES ARMY COURT OF MILITARY REVIEW ERRED IN DENYING APPELLANT'S REQUEST FOR A DUBAY HEARING.

3. *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967).

Also living in the aunt's house was Ms. Cogdill, the appellant's twenty-one-year-old step-cousin.

In mid–1988, Colleen was transferred to an Army position in Germany. She left Japan before the rest of the family, but they joined her in the summer of 1988 when the appellant was assigned to an aviation unit in Germany. In January 1989, Ms. Cogdill joined the family to live with them and be a "nanny" for the children. She anticipated that she would stay two years.

Ms. Cogdill's relationship with the appellant was strained, but good with the rest of the family. She decided to leave her job after only six months because she felt the appellant was taking out his feelings about her on the children. Before she left in June 1989 to return to the Denver, Colorado area, the appellant accused her of stealing money from him.

In October 1989, Ms. Cogdill was interviewed by civilian police in Colorado about a theft of money in Germany reported by the appellant. She told the police that she did not steal the money and she left Germany because she feared for her safety. She informed the police that the appellant had sexually assaulted her and that she believed the appellant was also sexually assaulting Staci.

Ms. Cogdill testified that she was sexually assaulted by the appellant during the vacation visit to her mother's Colorado house in February 1988. She was twenty-one at the time. The appellant entered her bedroom, and she awoke with the appellant's hand under her nightgown and panties. The appellant told her to be quiet and then left the room. She did not report this incident to anyone until she told the civilian police in October 1989.

Based on information provided by the civilian police of a potential sexual assault by the appellant on Staci, agents of the Criminal Investigation Command (CID) in Germany questioned Staci and Colleen in January 1990. By this time, the appellant and Colleen were having marital problems and were estranged.

Staci testified that starting in Japan when she was seven years old and continuing when the family lived in Germany, the appellant would enter her bedroom while her mother was away or asleep and sexually assault her. The appellant would run his hands over her entire body. He would also place his penis on her body and tried to place his penis in her vagina and anus. He made her place her mouth on his penis and swallow when he ejaculated in her mouth. He also placed his tongue on her vagina. These acts occurred many times, sometimes as frequently as twice a week. Shannon slept in the room with Staci, but since Shannon was younger, she never awoke when the appellant came into the room.

Staci further testified that the appellant showed her a videotape of her mother and the appellant engaged in various sexual acts. The videotape was made by the appellant to have while Colleen was away on temporary duty. Colleen gave the tape to the CID and it was admitted as a prosecution exhibit. The appellant told Staci that he wanted her to perform the acts depicted in the video.

When the CID informed Colleen of Staci's statement, Colleen told the CID that her marriage with the appellant was estranged and the appellant was having an affair with another woman. Colleen testified that in December 1989, she left for a TDY trip and the appellant was to stay with the children. She called home after arriving at the temporary duty site to discover that the appellant was not home and the children were alone. She returned home that evening. The appellant showed up early the next morning. The appellant told Colleen that he was having an affair with a woman he had met the previous August. Colleen had previously discovered in the trunk of the appellant's car an envelope with pictures of a blond woman in various provocative poses with minimal clothing. She returned the pictures except two which she saved and were admitted as prosecution exhibits. The appellant admitted to her that he was having an affair, to

include sexual intercourse, with the woman, Mrs. M.

36 MJ at 992–93.

### ISSUES I AND III

### INEFFECTIVE ASSISTANCE OF COUNSEL

### and

### DUBAY HEARING

3. Appellant contends that he received ineffective assistance of counsel in all stages of his court-martial. He also complains that the Court of Military Review should have ordered an evidentiary hearing under *United States v. DuBay*, 17 USCMA 147, 37 CMR 411(1967), to consider his complaint. He alleges: First, that his trial defense counsel failed to adequately prepare the case by failing to call vital defense witnesses. Second, that counsel failed to properly enter challenges of panel members; failed to object to admissibility of evidence of the videotape depicting sexual encounters between appellant and his wife; failed to effectively cross-examine Major (MAJ) Becker regarding his opinion of appellant; failed to move to sever the charges of adultery from that of indecent assault; and failed to secure a lost videotape of testimony of a child psychologist. Finally, that he was not adequately represented during the sentencing portion when counsel failed to call any witnesses; failed to object to inflammatory argument; and failed to present a sufficient argument. Final Brief at 9, 12, 13, 20, 22, and 24.

■ 4. Article 27, UCMJ, 10 USC § 827, and the Sixth Amendment of the Constitution guarantee a military accused the right to effective assistance of counsel. *United States v. DiCupe*, 21 MJ 440 (CMA), *cert. denied*, 479 U.S. 826, 107 S.Ct. 101, 93 L.Ed.2d 52 (1986); *United States v. Wattenbarger*, 21 MJ 41 (CMA 1985), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986); *United States v. Jefferson*, 13 MJ 1 (CMA 1982); and *United States v. Rivas*, 3 MJ 282 (CMA 1977). "This Court has followed the standards utilized by the federal courts in evaluating claims of ineffective assistance of counsel, stating that an accused is entitled to 'reasonably competent counsel' and requiring a showing of 'serious incompetency' which affected the trial result in order to reverse a conviction." *United States v. Scott*, 24 MJ 186, 188 (CMA 1987).

■ 5. The Supreme Court set out a two-pronged test to assist in the determination of effective assistance in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). This test has been applied by Courts of Military Review and is compatible with existing military standards. *See United States v. Haston*, 21 MJ 559 (ACMR 1985), *aff'd. on other grounds*, 24 MJ 313 (CMA), *cert. denied*, 484 U.S. 955, 108 S.Ct. 348, 98 L.Ed.2d 374 (1987); *United States v. Huxhold*, 20 MJ 990 (NMCMR 1985); and *United States v. Rogan*, 19 MJ 646 (AFCMR 1984). The *Strickland* test is as follows:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S.Ct. at 2064. Additionally, in *Lockhart v. Fretwell*, 506 U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the Supreme Court stated that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Id.* at ——, 113 S.Ct. at 842.

■ 6. There is a strong presumption of effective assistance which the defendant must overcome, and this can generally be accomplished by proving that the "acts or omissions" on counsel's part "were outside the wide range of professionally competent assistance." *Strickland v. Washington, supra* at 690, 104 S.Ct. at 2066.

**7.** Problematic to military practice, however, is the lack of a precise legal mechanism wherein a convicted military accused can litigate his or her claim of ineffective assistance of counsel. *See United States v. Dykes*, 38 MJ 270, 274 (CMA 1993), (Cox, J., concurring in the result). Thus, often we are confronted with collateral-style attacks on court-martial convictions during the pendency of the direct appeal of the trial. This case is such an example.

**8.** In *United States v. Lewis*, 42 MJ 1 (1995), we had an opportunity once again to examine an attack by appellant on the performance of his trial defense counsel. In that case, we recognized that the appellate courts may, indeed, be handicapped by the lack of evidence upon which to resolve claims of ineffective assistance of counsel. Furthermore, we recognized that resorting to affidavits or an evidentiary hearing such as was formulated in *United States v. DuBay, supra*, to consider claims of command influence may be necessary to resolve some post-trial attacks on counsel. *See also United States v. McGillis*, 27 MJ 462 (CMA 1988).

**9.** *Lewis* recognized that an appellant is not entitled to compel his trial defense attorney to furnish an affidavit, and he is not entitled to an evidentiary hearing as a matter of law, either as a statutory right under the Uniform Code of Military Justice or as a matter of a procedural right created in the Manual for Courts–Martial, United States, 1984. Rather, the evidentiary hearing envisioned in *DuBay, McGillis*, and *Lewis* is a creature of necessity, *i.e.*, the hearing is necessary to provide the appellate court with the facts required to resolve the issue before it. Thus, as we said in *Lewis*, before an order to produce evidence is issued, it is incumbent upon the appellate court to examine the record of trial in light of the post-trial allegations to determine if further information is needed to resolve the claim or if the issue can be resolved on the record before the court. If the claim can be resolved on the record, no post-trial evidence need be or should be sought by the appellate courts.

**10.** In this case, as in *Lewis*, trial defense counsel (a civilian practitioner in Germany) was first asked, then ordered, by the Court of Military Review to furnish an affidavit concerning his performance at trial. Unlike the defense attorneys in *Lewis*, who responded to the Court of Military Review's order by filing an objection to the order, counsel in this case has ignored the order to produce an affidavit. *See* 36 MJ at 996.[4] Notwithstanding this state of affairs, the Court of Military Review reviewed the record of trial without the responses from the trial defense counsel. The Court concluded that appellant was not denied effective assistance of counsel. *Id.* at 996.

**11.** We, likewise, find it unnecessary to resort to an evidentiary hearing to resolve the claim of ineffective assistance of counsel. We agree with the Court of Military Review. Appellant has not met the threshold burden to demonstrate that his trial lawyer's performance was ineffective under the tests established by this Court. Accordingly, relief is denied as to Issues I and III.

**12.** In reaching this conclusion, we first examine each of appellant's complaints about his lawyer's performance, mindful of the standard requiring us to conclude that counsel's performance was one of "serious incompetency." *United States v. DiCupe*, 21 MJ at 442. Our first point of inquiry is whether counsel had a reasonable trial strategy—one supported by the law and evidence. From our review of the record and the evidence, we conclude that he did.

**13.** Appellant was a very successful military aviator and warrant officer. His off-duty life, however, did not comport with his otherwise successful military career. He was caught with photographs of his partner in an adulterous relationship. The authori-

---

4. The Court of Military Review stated:

Mr. Nolan [the civilian trial defense counsel] was ordered by this Court to provide an affidavit concerning his performance at trial. He deliberately defied a legitimate order of this Court. We have referred his action to The Judge Advocate General of the Army and recommended that Mr. Nolan's certification to appear before courts-martial under Article 27, UCMJ, be revoked and his state bar licensing authority be notified.

36 MJ 990, 996 (1993).

ties also had possession of a lengthy video tape of appellant engaged in numerous sex acts with his wife, which he had allegedly used to coach his stepdaughter in how to perform sex acts, a strategic piece of evidence for the prosecution. Additionally, appellant had been ordered into arrest during the pendency of the investigation by his superior officer, MAJ Becker. He had breached the arrest and disobeyed the order of his commander.

14. During pretrial negotiations, appellant attempted to resign from the service in lieu of court-martial. The convening authority recommended approval. However, the request was disapproved at the Department of Army level.

15. It is apparent from defense counsel's opening and closing statements that the strategy was to not contest the military offenses. Rather, the plan was to attack the testimony of his estranged wife and the two alleged victims by showing that each had a motive to fabricate the evidence against him. Thus, the trial strategy centered upon painting appellant's wife as the woman scorned and his stepchild as one who made up stories about appellant's behavior to support her mother during the troubled times.

16. Appellant's difficulties were further complicated by allegations of sexual misbehavior with his stepcousin, Ms. Cogdill. Again, appellant elected a strategy of showing motive for Ms. Cogdill to give false testimony against him. It is within the confines of this strategy that we can evaluate each of appellant's complaints.

■ 17. Appellant's first general allegation is that his trial defense counsel failed to call sundry vital defense witnesses. The first of these witnesses was Chaplain Jerry L. Mize, who was expected to testify regarding Mrs. Ingham's character for untruthfulness and her manipulative nature. This witness was located in California, and notice was not given to the Government to produce the witness until 15 hours before trial. The military judge declined to order the Government to produce the witness. Although trial defense counsel's request for this witness was denied as untimely, the military judge also ruled,

based on the proffer, that the witness was not qualified to give an opinion as to psychiatric condition or disorder, and that he did not have enough contact with appellant's wife to give an opinion as to her truthfulness. Since the witness would not have been permitted to testify regardless of the timing issue, we agree with the Court of Military Review that appellant has not demonstrated prejudice.

■ 18. Next there is Mrs. Mabry, appellant's alleged mistress who, during the investigation under Article 32, UCMJ, 10 USC § 832, denied ever having had a sexual relationship with appellant. Mrs. Mabry did, however, admit that she and appellant spent a great deal of time together when her husband was not at home. Therefore her expected testimony, coupled with the photographs of her being scantily clad, certainly would have given proof of both opportunity and inclination to commit adulterous acts. By contrast, her predictable denial of violating her own marital vows is the sort of testimony that reasonable counsel could conclude might not advance the defense cause and, indeed, might well hurt it. Counsel's failure to call her as a witness appears to be a reasonable tactical decision.

■ 19. In his post-trial affidavit, appellant also asserts that he asked civilian defense counsel to secure the trial testimony of his daughter, Shannon, and that counsel was ineffective in failing to produce her. Shannon was younger than Staci and, over the years these incidents allegedly took place, often slept in the same bedroom with Staci. Staci testified that, on those occasions when appellant crept into their bedroom late at night and molested her, Shannon never awoke. Under the circumstances, it appears that a reasonable counsel could conclude that Shannon's testimony would not have contributed meaningfully to the defense.

■ 20. In the same affidavit, appellant complains that counsel was deficient in failing to produce the testimony of his former commander in Japan, Colonel Penzel, and the Army and Air Force Exchange Service Europe Commander, Brigadier General Robin-

son, for whom appellant had piloted in Japan. Appellant does not assert, or offer evidence, that either Col. Penzel or BG Robinson was prepared to or competent to assure the court-martial that appellant did not molest his stepdaughter in the privacy of his home or that he was, for some reason, incapable of such behavior. Instead of attempting to summon live general character witnesses on findings, civilian defense counsel introduced numerous of appellant's officer efficiency reports, commendations, and awards. It does not appear that this tactic prejudiced appellant; the point was well made that appellant's duty performance and duty character were outstanding.

21. Finally, in the same affidavit, appellant asserts that he asked civilian defense counsel to request the Government to produce two named experts on child-sexual-abuse allegations.[5] It is not represented that either of these experts had ever treated or examined appellant or Staci, or that they had any knowledge of the facts of this case. Nevertheless appellant asserts in his affidavit that, based on their published works, at least one of the experts would have pronounced that "approximately 85% of allegations of child sexual abuse arising out of divorce proceedings were found to be false." In addition, according to appellant, that expert's "testimony could have had a devastating effect on the actual interviewing techniques used by the CID when questioning Staci." Appellant labels counsel's failure to seek production of the witnesses as inadequate performance.

 22. We note, however, that assertions such as the former, regarding the percentage of false allegations of child sexual abuse, are not admissible just because somebody with a diploma says it is so. First, basic foundations of scientific validity have to be met, *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Gipson,* 24 MJ 246 (CMA 1987), and it is impossible

for us to speculate that such assertions might have been validated. Second, the proposition asserted must appear to be relevant to an issue in the case. Even if this assertion could be established scientifically, it is an open question whether it would assist a factfinder in determining whether this particular allegation fell into the 85% group or the 15% group. *See United States v. Banks,* 36 MJ 150, 176 n. 6 (CMA 1992) (Cox, J., dissenting). Third, the assertion that this particular expert could devastate Staci's story is grossly speculative in that it is not represented that this expert knew anything at all about her story or the authorities' questioning of her. One does not establish the ineffectiveness of his defense counsel merely by asserting that some expert would have said something consistent with an accused's views.

 23. Moreover, appellant's right, upon a minimal showing of need, is to expert assistance. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *United States v. Tharpe,* 38 MJ 8, 14 (CMA 1993); *United States v. Garries,* 22 MJ 288 (CMA), *cert. denied,* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986). He does not have a right to compel the Government to purchase for him any particular expert or any particular opinion. Appellant's implicit assertion of a right to production, at government expense, of named experts of known opinion is unfounded.

24. Lest we lose track of the real issue, we must remember that it is not what a certain expert might or might not have opined, but whether defense counsel was ineffective in contesting the assertions of the victim. Thus the question is—how did counsel deal with the witness' testimony?

 25. In the instant case, Staci testified, consistent with her Article 32 testimony, that appellant first began abusing her when she was about 7–years old and they lived in Japan. She reported the incidents to her

---

5. Appellant did not raise these assertions of having requested civilian defense counsel to produce Shannon, his former military supervisors, and these two experts as witnesses in his post-trial submission to the convening authority or on orig-

inal appeal to the Court of Military Review. It appears that the first time these assertions were raised was by means of a petition for reconsideration at the Court of Military Review.

mother but, upon being confronted by appellant, she retracted the accusations. A year or so later, when Staci was about 8, she again told her mother that appellant was abusing her. This accusation was false, as Staci acknowledged at the Article 32 investigation and at trial. She deliberately lied at that time because she wanted her mother "to divorce" appellant. After her false accusation, according to Staci's testimony, the sexual abuse recommenced and escalated for several more years, continuing through the family's relocation to Germany. However Staci apparently did not attempt to report it to her mother again. Even after CID officials came to the residence in Germany, based on the tip from Ms. Cogdill, Staci gave inconsistent statements to law enforcement officials. Further, she told her mother initially that the abuse did not occur, reasoning that she feared her mother "would probably start crying, and I didn't want her to."

26. Trial counsel, for his part, did not insist that Staci's testimony must be true because children never lie about these sorts of things. In final argument, he stated, "Well, the Government will be the first to admit that children sometimes lie."

27. Therefore, the issue of Staci's credibility was squarely before the court members.[6] Whether an expert would have added anything meaningful is purely speculative. In any event, it is not fair to put on blinders when criticizing counsel for failure to call an expert. Expert testimony, when injected by a party, often opens the door to experts in rebuttal. In the instant case, it appears counsel was deliberately trying to minimize the impact of adverse expert testimony on sentencing. *See infra.* The possibility of accelerating adverse evidence into the merits cannot be ignored. Since counsel was able to place the question of Staci's credibility before the court-martial without triggering a battle of experts, we cannot agree with appellant that counsel was necessarily deficient in failing to produce experts.

28. We find appellant was not denied effective assistance with respect to any of these witnesses.

29. The second general allegation of ineffective assistance is that civilian defense counsel failed to properly exercise his challenge of Chief Warrant Officer 3 (CW3) Day. Counsel challenged CW3 Day for cause, but the military judge denied the challenge. Counsel then exercised appellant's only peremptory challenge against CW3 Day. Appellant now complains that his counsel was ineffective by failing to note that, had his challenge for cause against Mr. Day been sustained, he would have used a peremptory challenge against another member. RCM 912(f)(4), Manual for Courts–Martial, United States, 1984.

30. Mr. Day was asked, "Well, in view of your inability to recollect that particular instance without being reminded about it, is it possible that you are predisposed to believe such allegations of child abuse as opposed to not believing them?" Mr. Day responded, "Possible." This response was clarified by questions from the prosecutor and the military judge. The military judge has considerable discretion in deciding whether to excuse a member for cause, and our standard of review is whether the judge abused his discretion in not granting a challenge for cause. *United States v. White,* 36 MJ 284 (CMA 1993). We agree with the Court of Military Review that the judge did not abuse his discretion here. As the military judge committed no error in declining to excuse the members for cause, the issue of counsel's failure to preserve a back-up peremptory challenge is moot.

31. Third, appellant complains that his counsel was ineffective in failing to object to admissibility of the videotape depicting sexual encounters between appellant and his wife. The victim testified that appellant showed her the videotape [pros. ex. 1], told her he wanted her to perform the acts depicted in the video, and then placed his penis in her mouth. Appellant complains that he was prejudiced in that the videotape con-

---

6. For the same reasons, appellant's claim that Staci's younger sister, Shannon, would have

meaningfully undercut Staci's credibility appears remote.

tained evidence of uncharged misconduct. Mil.R.Evid. 404(b), Manual, *supra.* However, one of the indecent-liberties charges leveled against appellant stems from the very fact of his showing this videotape to the victim and telling her, "This is what I want you to do." Thus the videotape was tangible physical evidence (*i.e.,* an instrumentality) of *charged* misconduct. The fact that the conduct depicted was not separately charged[7] does not dilute its extreme relevance to the charge involving its use. The defense also complains that the judge erred in permitting the court members to view the entire tape, contending that Staci did not see all of it. However, there is no evidence of record to show she only saw a portion of the video. The failure of counsel to object to obviously admissible evidence was not what prejudiced appellant.

■ 32. Appellant next alleges ineffectiveness in defense counsel's failure to cross-examine MAJ John A. Becker, his commander since 1988. MAJ Becker testified he would not believe appellant under oath. The only questions asked by the defense were to determine whether he was the senior rater or the individual who preferred charges. Appellant's position is that MAJ Becker should have been cross-examined about appellant's favorable evaluation reports.

33. Since this was appellant's commander, a person who had frequent contact with him, it cannot just be assumed that cross-examination would have been productive for the defense. Appellant pleaded guilty, after all, to disobeying MAJ Becker's orders and two specifications of breaking arrest. The possibility that MAJ Becker might add unflattering details arising after appellant's last rating cannot be discounted, and counsel may well have known it. Wider cross-examination of MAJ Becker may have merely solidified the position of the Government. Appellant's unsupported assertion does not meet his burden of showing that counsel erred in failing to cross-examine MAJ Becker.

■ 34. Appellant's fifth allegation is that trial defense counsel should have moved to sever the adultery specification and the specification alleging indecent assault on Ms. Cogdill from the sodomy/indecent-liberties/indecent-acts-on-a-minor charges. What appellant now conveniently overlooks is that the former two specifications were central to the theory of the defense as to the far more serious and numerous latter specifications. Because of the pictures found by appellant's wife, the defense theorized that, out of revenge, she induced Staci to fabricate the accusations of child abuse. Ms. Cogdill, for her part, was the person who first tipped the authorities as to her suspicions that appellant was sexually abusing Staci. Appellant assigns to Ms. Cogdill the motive of revenge for his accusing her of theft. As such, the specifications involving adultery and assault on Ms. Cogdill were integrally related to the other two specifications. Even had defense counsel sought severance, it is far from clear that it would or should have been granted. The fact that, in hindsight, it appears that one tactical choice failed does not establish that a different tactic would have succeeded or that counsel was deficient in pursuing the former tactic.

■ 35. Sixth, appellant accuses his counsel of ineffectiveness for failing to secure a videotaped deposition of a child psychologist. The record reflects that the deponent had treated Staci on numerous occasions, that the deposition was taken due to a concern that the witness would not be available for trial, and that civilian defense counsel was present and participated in the deposition. At trial, both sides stipulated to the accuracy of a written transcription of a portion of the deposition; this partial transcript was offered in evidence on sentencing and read to the court members.

36. By post-trial affidavit and appellate brief, however, appellant now maintains that portions of the deposition not admitted at trial flatly contradicted the apparent meaning of that portion of the deposition in evidence. Further, appellant contends that the videotape of the deposition was mysteriously

---

7. A specification alleging the sodomy depicted on the videotape was originally charged, but the prosecution elected at the outset of trial not to present evidence on it.

"lost" due, somehow, to his counsel's unspecified neglect. Thus, appellant contends that his civilian defense counsel was ineffective in permitting the videotape to be lost and in permitting the stipulated portion of it to be introduced.

37. In our view, appellant's uncorroborated claims are insufficient to cause us to doubt the representativeness of that portion of the deposition which was stipulated as being a verbatim transcript or cause us to initiate a wild goose chase for a "lost" videotape. We detect no prejudice in counsel's election to suffer the damage in written, plain-vanilla form, as opposed to underscoring it through potentially more powerful video or live testimony.

38. Finally, appellant argues that he was not provided effective assistance during the sentencing portion of the trial due to his counsel's failure to call any witnesses and presentation of a short sentencing argument, in addition to counsel's failure to object to trial counsel's argument. We have reviewed carefully the sentencing portion of the trial. We find that the members had before them the military record of appellant, including 16 outstanding efficiency reports and evidence of appellant's military awards. Importantly, they had appellant's unsworn statement depicting a person who had overcome serious childhood problems including a mentally ill mother, a mixed-race heritage, and an alcoholic grandfather, and as a person who had made a great success of himself as a career army aviator. Although his defense counsel's final argument was short, it was direct, to the point, and placed the sentencing considerations squarely before the panel. We cannot say that the sentencing efforts of counsel were marred by "serious incompetency."

39. In sum, the heart of the Government's case was the credibility of the three witnesses, and that became civilian defense counsel's point of attack. To undercut that credibility, counsel attempted to demonstrate the improbability of their claims, their inconsistencies, and their motives to falsify. He did this largely through cross-examination, but also through appellant's own testimony on direct examination and on evidence of his outstanding military character. Plainly, counsel pinned his hopes of acquittal on raising a reasonable doubt as to the sufficiency of the Government's own proof. Apparently, he elected not to risk bolstering the Government's case by opening the door to certain potentially adverse evidence. The test of counsel's performance is not that he lost; and it is not that some number of options were not pursued or could have been pursued differently—without regard to the degree of utility or the potential hazard of each.

40. We have reviewed this record carefully and in considerable detail. In our view, none of the defects here alleged, either individually or in combination, are sufficient to overcome the presumption of effective assistance. Issue I is thus without merit, so Issue III is moot.

## ISSUE II

### SENTENCE APPROPRIATENESS

41. Following findings and a separate hearing on sentence, the military judge instructed the members that

> the maximum punishment that may be adjudged is, you may adjudge a dishonorable discharge; you may adjudge total forfeitures; you may adjudge confinement up to, but not exceeding, 92 years and 6 months.

The correctness of this instruction is not in issue.

42. After a short deliberation, the members sentenced appellant to total forfeitures; to be confined for 40 years; and to be dishonorably discharged from the service. The Court of Military Review found the sentence to be "appropriate." 36 MJ at 997.

43. Neither appellant nor the Government cite legal authorities as to the scope of our review for sentence appropriateness. It is well-settled, however, that our review is limited to questions of law. Art. 67(c), UCMJ, 10 USC § 867(c) (1989). *See United States v. Olinger,* 12 MJ 458, 460 (CMA 1982), citing *United States v. Doran,* 9 MJ 385, 386 (CMA 1980); *United States v. Dukes,* 5 MJ 71, 72–73 (CMA 1978). First,

and obviously, we review sentences to determine if they are authorized by the maximum punishment and the sentencing rules found in the Manual for Courts–Martial. *See* Art. 56, UCMJ, 10 USC § 856. Likewise, we review sentences to ensure they are not "cruel or unusual punishment" within the meaning of Article 55, UCMJ, 10 USC § 855, or "cruel and unusual punishment" within the meaning of the Eighth Amendment to the Constitution. *See United States v. Ballard,* 20 MJ 282 (CMA 1985). Also, sentences may be unlawful if based upon "outside influence," *United States v. Accordino,* 20 MJ 102, 104 (CMA 1985); or "unlawful command influence," *United States v. Thomas,* 22 MJ 388, 394 (CMA 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). *See* Mil.R.Evid. 606(b). It should also be noted that, to the extent sentences are affected by trial errors, such as erroneous rulings on evidence, erroneous instructions, or lack of proper instructions, we have often reviewed such errors for prejudice. Art. 59(a), UCMJ, 10 USC § 859(a). Additionally, we have reviewed sentences to determine if they were the result of improper or inflammatory argument by trial counsel. *United States v. Clifton,* 15 MJ 26 (CMA 1983).[8]

 44. After careful review of this record of trial and the evidence introduced before the members both on findings and sentence, we conclude that the sentence, albeit in our experience it contains rather lengthy confinement, is nevertheless lawful. *United States v. Olinger,* 12 MJ at 460.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges CRAWFORD, GIERKE, and WISS concur.

---

**8.** One of appellant's contentions is that trial counsel made an improper and inflammatory argument on sentence and that his defense counsel was ineffective for failing to object to the argument. We have rejected that claim of ineffective assistance. In fairness to appellant, we have considered whether the argument was nevertheless error and, if so, whether it was "plain error." *See* Mil.R.Evid. 103, Manual for Courts–Martial, United States, 1984; *United States v. Fisher,* 21 MJ 327 (CMA 1986). We conclude that the argument was fair comment upon the evidence and was not designed to arouse or inflame the passion or prejudice of the members. *United States v. Shamberger,* 1 MJ 377 (CMA 1976).